**IN THE MATTER OF:**

**WILLIAM A., the Student,**
*By and Through his Parents,*
**E.A. and C.A.**

*Plaintiffs*  NO. _____

*v.*  **JURY DEMANDED**

**CLARKSVILLE-MONTGOMERY COUNTY SCHOOLS**

*Defendant*

# COMPLAINT

**COME THE PLAINTIFFS, William A.**, through his parents, E.A. and C.A., filing this Complaint. They show:

### I. PARTIES AND JURISDICTION

1. William A. is the student. He resides with his parents, E.A. and C.A., in Clarksville, Tennessee.[1]

---

[1] The student and parents are already known to and have been identified to Defendant through an underlying due process case under the Individuals with Disabilities Education Act. Because William A. has a disability, and this case features that disability, he seeks to proceed by his common first name and a pseudonym for his last name, and initials for his parents.

2. The Clarksville-Montgomery County School System (CMCSS) is the governmental entity providing education for students residing within Clarksville-Montgomery County. It receives state funding under Section 504 and federal funding under Title II of the ADA.

3. This action arises out of the following federal statutes: Americans with Disabilities Act, 42 U.S.C. §12132 et. seq., and Section 504 of the Rehabilitation Act, 29 U.S.C. §794(a), Section 1983 and the Equal Protection and Substantive Due Process Clauses of the Fourteenth Amendment. The Court's jurisdiction is invoked pursuant to 28 U.S.C. §1331.

4. Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b), as Plaintiffs reside within the jurisdictional boundaries of the Middle District of Tennessee (Montgomery County) and all events and omissions giving rise to this Complaint occurred in this judicial district (again, Montgomery County).

5. Any administrative exhaustion that may be necessary under the Individuals with Disabilities Act, for relief available therein, has occurred, by virtue of a due process hearing and final administrative order finding Defendant violated the IDEA (denying him FAPE), ADA, and Section 504 on July 28, 2023. Defendant's motion for reconsideration was denied August 22, 2023.

## II. FACTS

### A. William A. Has a Qualifying "Disability"

6. William has a "disability" under the ADA and Section 504.[2] While CMCSS records show William has an average IQ (Full Scale of 99 with a General Ability Index of 115), he

---

[2] A "disability" under the ADA and Section 504 is one that substantially limits one or more major life activities of such individual. 42 U.S.C.S. § 12102(1)(A). Courts construe the term disability broadly. 42 U.S.C.S. § 12102(4)(A). As to the term "impairment," the applicable

has the learning disability of dyslexia, along with Autism and ADHD. His dyslexia,[3] alone and in combination with other conditions, substantially limits him in reading, learning, and processing information.[4]

### B. William's History of Reading Limitations

7. William's family moved to Clarksville for his fifth-grade year in 2016-2017.

8. CMCSS accepted that he had reading limitations and documented those limitations in an Individual Education Plan stating his "Specific Learning Disability" (SLD) and "Language Impairments." The word "dyslexia," a *type* of specific learning disability, does not appear,

---

Department of Justice regulations provide that the term physical or mental impairment includes ADHD and dyslexia and other specific learning disabilities. 28 C.F.R. § 36.105(b)(2).

[3] "Dyslexia is a specific learning disability that is neurobiological in origin. It is characterized by difficulties with accurate and/or fluent word recognition and by poor spelling and decoding abilities. These difficulties typically result from a deficit in the phonological component of language that is often unexpected in relation to other cognitive abilities and the provision of effective classroom instruction. Secondary consequences may include problems in reading comprehension and reduced reading experience that can impede growth of vocabulary and background knowledge." *See* Definition of Dyslexia, Int'l Dyslexia Ass'n (2002), *available at* https://dyslexiaida.org/definition-ofdyslexia/ (last visited Oct. 15, 2023).

[4] As to "life activities," the ADA provides that major life activities include reading, concentrating, thinking, communicating, and working. 42 U.S.C.S. § 12102(2)(A). The regulations explain that an impairment is a disability if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. 28 C.F.R. § 36.105(d)(1)(v). Accordingly, not every impairment will constitute a disability, but an impairment will meet the definition of disability if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. 28 C.F.R. § 36.105(d)(1)(v).

although use of the term "dyslexia" in an IEP certainly is neither prohibited[5] and may even be necessary.[6]

9.      Through the years, CMCSS performed a number of reading assessments on William A. These assessments showed exceptionally poor results,, particularly in "Reading Fluency," a hallmark of students with dyslexia:

**READING FLUENCY**

| Date of Assessment | Percentile | Citation[7] |
|---|---|---|
| August 24, 2016 | 2nd percentile | HRG EX. 1, BATES NO. 0040 |
| October 17, 2016 | 1st percentile | HRG EX. 5, BATES NO. 00211 |
| March 25, 2018 | 1st percentile | HRG EX. 3, BATES NO. 00154 |
| March 4, 2019 | 9th percentile | HRG EX. 4, BATES NO. 00176 |
| January 13, 2020 | Less than the 1st percentile | HRG EX. 5, BATES NO. 00233 |
| November 30, 2020 | 1st percentile or 6th percentile[8] | HRG EX. 11, BATES NO. 00267 |
| January 12, 2022 | 1st percentile | HRG EX. 13, BATES NO. 00267 |
| August 26, 2022 | 2nd percentile | HRG EX. 19, BATES NO. 04689 |
| January 9, 2023 | Less than 1st percentile | HRG EX. 5, BATES NO. 0341 |
| January 11, 2023 | 3rd percentile | HRG EX. 19, BATES NO. 04689 |

---

[5]     *Dear Colleague Letter*, 66 IDELR 188 (OSERS 2015), attached hereto as Appendix 1.

[6]     *Letter to Unnerstall*, 68 IDELR 22 (OSEP 2016), attached hereto as Appendix 2.

[7]     Reference is made to exhibits in the IDEA due process hearing, with this chart being reflected in the Final Order of the Hearing Officer.

[8]     These two scores apparently come from two different screeners, aReading and Autoreading, respectively.

10. In spite of these results and William's stagnation in reading (at times even regressing in reading), by its own admission, CMCSS failed to provide William any dyslexia specific interventions.[9] Rather, CMCSS provided William with unsuccessful accommodations[10] and virtually identical and repeating IEP goals year after year. William heavily relied upon artificial technology assistance to complete his work for him.

11. CMCSS *knew* that William was desperately struggling with the basic, building blocks of reading. On January 13, 2020, CMCSS's school psychologist (Wooten) conducted an assessment as part of a psychological evaluation. This revealed that William had a *negative* rate of improvement in reading fluency (-1.21). It also showed William was "*regressing* in the number of words he reads correctly per minute." CMCSS's school psychologist specifically commented of William: "he experiences great difficulty with foundational reading skills needed to become a fluent reader."

12. Even though dyslexia is characterized by difficulties with accurate and/or fluent word recognition, and by poor spelling and decoding abilities, and even though CMCSS knew William had a specific learning disability, CMCSS still failed to address his basic reading skills deficit and provide William with dyslexia-specific interventions from a trained teacher.

13. Ironically, CMCSS takes the flagrantly absurd position that students with "characteristics of dyslexia" receive dyslexia-specific interventions through an individual learning

---

[9] (Final Administrative Order, p. 33) (citing Interrogatory Answer).

[10] For example, read aloud technology, speech to text, redoing assignments, extra time, etc.

5

plan through state board regulations,[11] but that students with *actual dyslexia* who are served under an IEP for SLD, like William, do *not* receive dyslexia-specific interventions.[12] And consistent with this gross misjudgment, CMCSS continually failed to provide the appropriate interventions for dyslexia, leaving William illiterate year after year.

14. On January 29, 2020, *the same day* his Individualized Education Plan was updated, William's special education teacher, Dr. Candice Leaverton, asked another school psychologist, Ms. Megan Christensen, to "[p]lease take a look at William Anderson. I am very concerned." Leaverton stated: "this kid can't read." Yet even at this point, no dyslexia-specific interventions were provided to William as his IEP programming and supports did not change from the prior years.

15. By eleventh grade, CMCSS's teachers remained aware of William's inability to read. William's 11th grade English teacher, Ms. Hargett-Slack, confided to William's mother that William *has a reading problem, he cannot read.*

**C. CMCSS's Failed to Assign Teachers Trained in Teaching Reading for Dyslexia**

16. Specific Learning Disability is the broad IDEA *category*. Its umbrella includes a number of disorders, not just dyslexia. Others include auditory processing disorder, nonverbal learning disabilities, executive functioning disorders, and a reading difficulty for a separate reason. Likewise, dysgraphia is a type of learning disability under the category of SLD in written expression.

---

[11] Tennessee Rules and Regulations, 0520-01-22-.02(1)(d).

[12] *See, e.g.,* William A. v. CMCSS, No. 3:23-cv-00912, D.E. 6, CMCSS Counterclaim, at page 5, ¶2 (citing 0520-01-22-.02(1)(d)).

6

17. Remediating the different types of SLD is not one-size-fits all. Obviously, each type of specific learning disability, whether it is dyslexia or another, must be addressed through the appropriate interventions *for that subtype.* Thus, for dyslexia, multisensory dyslexia-specific interventions are required—which CMCSS admittedly was not providing.

18. On November 13, 2022, William's mother requested, and then later received, an outside evaluation performed by psychologist Dr. Rebecca Townsend. Dr. Townsend diagnosed William's dyslexia and dysgraphia.

19. Despite the Wooten report by CMCSS, the years of William's documented struggles to read and stagnant (if not regressive) progress, all of the other assessments, and the teachers' comments about William's illiteracy, this Townsend report in 2022—merely because it used the term "dyslexia"—represented the first time that CMCSS even considered the Specific Learning Disability of *dyslexia.* And without using the *word,* CMCSS grossly failed to deliver dyslexia-specific interventions from fifth grade through eleventh grade. This is not an isolated event. CMCSS has a pattern, policy, or practice of allowing students with SLD to suffer with illiteracy rather than provide them teachers trained in recognizing the subtype of dyslexia and teaching these students with dyslexia to read. Thus, CMCSS is not meeting William A.'s reading needs, as a student with SLD, as adequately as it meets the reading needs of students without an SLD.

20. In *Matthew B. v. CMCSS*, No. 3:22-cv-00675 (W.D. 2023), another student with SLD (also having dyslexia) did not receive teachers trained in recognizing and delivering dyslexia-specific interventions. In fact, Ms. Christensen (the CMCSS school psychologist) testified that,

7

to her knowledge, *"none of my literacy transitions teachers have been provided formal training in any dyslexia specific interventions/ programs that we have available in our district."*

21. Ms. Christensen is correct. By not assigning students *with dyslexia* to teachers who are trained in delivering multi-sensory dyslexia-specific supports, students like William A. and Matthew B. proceed through layers of teachers, passed from grade to grade year after year, and despite their obvious illiteracy, CMCSS fails to meet their literacy needs as adequately as it meets the needs of students without an SLD.

22. After the Townsend report, William's mother obtained dyslexia-specific recommendations from the Clarksville Center for Dyslexia and Learning Differences.

23. At the February 2023 IEP meeting to discuss the Townsend report, William's advocate and parent specifically requested the reasonable accommodation of 1:1 student-teacher ratio of dyslexia-specific interventions for William to be delivered through personnel trained in providing dyslexia-specific interventions.

24. *Even after those specifically requested accommodations*, CMCSS *still* refused to deliver dyslexia-specific interventions even for basic reading skills. Accordingly, William's family had the interventions provided, at their expense, through the Clarksville Center for Dyslexia and Learning Differences.

### D. Artificial Grades and Graduation Track

25. Without the appropriate reading interventions, CMCSS left William illiterate, content to pass him along.

26. As a teenager with a phone and laptop, William used "bots" and "Chat-GTP" to artificially create his homework and grades to fend for himself—never actually learning to read

through accommodations of dyslexia-specific supports. CMCSS, knowing he cannot read, passed him right along, creating an artificial GPA of 3.41 by the end of eleventh grade and putting William on a path to a regular education diploma, even though he lacked *basic reading skills*. William would not even be able to read the words written on a diploma.

27. By March 2023, William could not consistently spell his own first and last name when signing his IEP. And in June 2023, William's own writing sample illustrated he was unable to write more than thirty-one (31) words in three (3) minutes. He misspelled half the words, all of which were Kindergarten level sight words he had memorized. (See Exhibit A, June 2023 Writing Sample).

28. Furthermore, despite the July 28, 2023 Final Order of the ALJ finding that CCMCS violated the IDEA, Section 504, and the ADA and ordering CMCSS to provide William with 888 hours of compensatory education in the form of 5 sessions per week at 1 hour per session of dyslexia tutoring from a reading interventionist trained to provide dyslexia tutoring through the Wilson Reading and Language System, and the August 22, 2023 Order by the ALJ declining to change that award upon a request for reconsideration by CMCSS, to date CMCSS has deliberately continued to deny the provision of those dyslexia intervention services to William A.

29. The actions of CMCSS, as described throughout, were arbitrary and capricious, and evinced a gross misjudgment through William's educational life at CMCSS. The CMCSS administration, and special education personnel, injured William vocationally. CMCSS also injured William emotionally, as he experienced years of shame and humiliation at never being able to read.

## III. LEGAL CLAIMS

30. An inability to read—illiteracy—is far reaching.

> "Illiteracy is an enduring disability. The inability to read and write will handicap the individual deprived of a basic education each and every day of his life. The inestimable toll of that deprivation on the social, economic, intellectual, and psychological well-being of the individual, and the obstacle it poses to individual achievement, make it most difficult to reconcile the cost or the principle of a status-based denial of basic education with the framework of equality embodied in the Equal Protection Clause."

*Plyler v. Doe*, 457 U.S. 202, 222 (1982).

### A. Americans With Disabilities Act and Section 504

31. With the ADA, "Congress provided [a] broad mandate" to "effectuate its sweeping purpose[ to] ... forbid[] discrimination against disabled individuals in major areas of public life, [including] ... public services ...." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675 (2001). It is "a milestone on the path to a more decent, tolerant, progressive society." *Id.* (quoting *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 375 (2001) (Kennedy, J., concurring)).

32. The ADA mandates that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; *see also* 28 C.F.R. § 35.130.

33. The regulations implementing Title II of the ADA state that [a] public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability . . . (i) Deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service; (ii) Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or

service that is not equal to that afforded others; (iii) Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others; (iv) Provide different or separate aids, benefits, or services to individuals with disabilities or to any class of individuals with disabilities than is provided to others unless such action is necessary to provide qualified individuals with disabilities with aids, benefits, or services that are as effective as those provided to others; . . . [or] (vii) Otherwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service. *Id.* § 35.130(b)(1)(i), (ii), (iii), (iv), (vii).

34. Further, Title II regulations require public entities to "make reasonable modifications" to their programs and services "when the modifications are necessary to avoid discrimination." 28 C.F.R. § 35.130(b)(7)(i).

35. Section 504 is a federal law that protects individuals with disabilities in programs and activities that receive federal financial assistance. 29 U.S.C. § 794; 34 C.F.R. §§ 104.1, .4. Specifically, Section 504 states that "[n]o otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . . " 29 U.S.C. § 794(a). Thus, Section 504 applies to all school districts that receive federal financial assistance. *Id.* § 794(b)(2); 34 C.F.R. § 104.31. Section 504, too, requires provision of reasonable modifications. 29 U.S.C. 794(a); 28 C.F.R. §41.53.

36. According to Section 504's implementing regulations, school districts must "designate at least one person to coordinate its efforts to comply with this part." 34 C.F.R. §

11

104.7(a). School districts must provide "appropriate education" to a "qualified handicapped person." *Id.* § 104.33. A student with a disability satisfies the definition of a "qualified handicapped person" if the student "(i) has a physical or mental impairment which substantially limits one or more major life activities [such as learning or reading], (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment." 34 C.F.R. § 104.3(j).

37. Section 504 prohibits school districts from discrimination against students who meet the definition of a "qualified handicapped person." Specifically, [a] recipient, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of handicap: (i) Deny a qualified handicapped person the opportunity to participate in or benefit from the aid, benefit, or service; (ii) Afford a qualified handicapped person an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others; (iii) Provide a qualified handicapped person with an aid, benefit, or service that is not as effective as that provided to others; (iv) Provide different or separate aid, benefits, or services to handicapped persons or to any class of handicapped persons unless such action is necessary to provide qualified handicapped persons with aid, benefits, or services that are as effective as those provided to others; . . . or (vii) Otherwise limit a qualified handicapped person in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving an aid, benefit, or service. *Id.* §§ 104.4(b)(1)(i)-(iv), (vii).

38. For aids, benefits, or services to be "equally effective," students who are "qualified handicapped persons" must be given "equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement, in the most integrated setting appropriate to the person's needs." Id. § 104.4(b)(2).

39. CMCSS violated the **ADA and Section 504** by denying William:

(i) the opportunity to participate in or benefit from teachers trained in delivering dyslexia-specific interventions for his reading limitations;

(ii) an aid, benefit or service for his reading that is as effective in affording equal opportunity to obtain the same result or benefit of learning to read afforded to non-disabled students;

(iii) the enjoyment of the privilege of learning to read as compared to others; and

(iv) the reasonable accommodation of dyslexia-specific interventions by appropriately trained staff.

40. Additionally, CMCSS provided William with differential treatment with a grade point average and diploma track that is plainly artificial and does *not* reflect the same level of achievement as provided to other non-disabled peers.

41. In fact, even after he was finally evaluated in eleventh grade, and even after being found by the ALJ to have violated the ADA and Section 504 by not providing dyslexia-specific interventions to William, CMCSS still refused to provide William with the needed dyslexia-specific interventions. Thus, even at that point, and *knowing* the damage it had done, CMCSS exercised gross misjudgment in failing to deliver what is needed.

42. CMCSS's deliberate failures to assign personnel trained in dyslexia-specific interventions have caused William dignitary harm and shame, being made to feel "dumb" and inadequate.

43. But more than that, CMCSS's failure to live up to the contractual expectations of its receipt of federal funds will harm William in both life and work. He also will suffer lost

opportunity damages. Specifically, illiteracy affects, and will continue to affect William, in profound and staggering ways relating to his engagement in public life—the right to vote, understand contracts and rights, find work, pay bills, read medication labels, secure housing, and *participate in his own education*.[13]

44. CMCSS received federal funds in exchange for *not discriminating* against qualified individuals with a disability. William is a third-party beneficiary of that contract and, with it, the expectation of learning to read with appropriate accommodations so that he can meaningfully access public life and secure its benefits like non-disabled persons.

45. For a staggering seven years, and continuing, it failed to provide reasonable accommodations/modifications so that William could learn to read, ensuring an inferior educational experience.

46. As a result, he has suffered broad irreparable harm, including substantial losses of educational opportunities. For his damages claims, CMCSS's discrimination was knowing, deliberately indifferent, and a gross misjudgment.

47. Accordingly, he seeks declaratory relief of violation of the ADA, along with dignitary and expectation damages, including but not limited to, lost or diminished earning capacity and appropriate damages for the impact of not being able to fully engage in public life as those who were taught to read. He seeks his reasonable attorneys fees and costs.

---

[13] *See* "Price of Literacy Translates Into Poverty and Humiliation," *available at* https://www.nytimes.com/1988/09/06/us/price-of-illiteracy-translates-into-poverty-and-humiliation.html (last visited September 30, 2023).

## B. Violations of the United States Constitution – 14th Amendment's Equal Protection and Substantive Due Process Clauses

48. William, as a member of a protected class, enjoys federal constitutional rights secured by the Fourteenth Amendment to enjoy equal access to literacy notwithstanding his dyslexia.

49. CMCSS is a local governmental unit (a "person") who has engaged in a constitutional deprivation that was the product of a policy, practice, or custom that led to Plaintiff's injury—failing to provide the same level of reading-access for the condition of dyslexia that it provides to non-dyslexic students.

50. Persons like William learn to read *differently* than other CMCSS students because they require dyslexia-specific interventions. CMCSS was deliberately indifferent to the Plaintiff's learning disability—dyslexia—in comparison to his peers who were taught to read, and who did actually *earn* grades, through traditional systems. There is no governmental interest in denying students with dyslexia, like William, the supports, albeit different, needed for literacy.

51. William is required by compulsory attendance laws to attend school. Yet CMCSS has a widespread and persistent practice of deliberately denying dyslexia-specific instruction by trained teachers for students who, like him, have SLD-dyslexia. These students, like William A. and Matthew B., are left to "sink or swim" through stock accommodations that are *insufficient* to address their dyslexia.

52. CMCSS refuses to provide dyslexia-specific interventions through personnel capable of doing so, meaning these persons like William "sink." CMCSS deliberately allows these students to "drown" in illiteracy rather than provide the differential instruction needed for them to become literate. This affects William not only in the broader realm of education, but literacy

affects many facets of his life: the voting booth (he cannot discern instructions); in restaurants and places of public accommodations (e.g. he cannot read a menu); in paying taxes (he cannot read the forms/instructions); or basic access to the nation's legal system without assistance.[14]

53. CMCSS also has a practice of inflating grades and the graduation track artificially despite the student's deficiencies (not being able to read), thereby boosting CMCSS's graduation statistics with the State. This reduces the costs for its personnel to appropriately remediate and accommodate dyslexia.

54. It is these policies, practices, or customs that, with deliberate indifference, caused Plaintiff's injury. This is a deliberate choice to follow this course of action, known and accepted at within the special education administration.

55. Even if this practice is not made an "explicit policy," it is an ongoing, settled, and persistent practice for many years that has harmed Plaintiff, and others with dyslexia.[15]

56. *Training* its employees to teach persons with dyslexia is more than providing stock accommodations (i.e. speech to text, extended time, and preferential seating). As a result of this failure to train, William has remained at a first grade (or less) reading level his entire educational career—literally still trying to learn his "blends" and "sight words."

57. Even after the parents uncovered the dyslexia through their own independent evaluation and requested that CMCSS provide one-one-one dyslexia-specific interventions from a

---

[14] "The stigma of illiteracy will mark them for the rest of their lives. By denying these children a basic education, we deny them the ability to live within the structure of our civic institutions, and foreclose any realistic possibility that they will contribute in even the smallest way to the progress of our Nation." *Plyler v. Doe*, 457 U.S. at 223-224.

[15] Including *Matthew B. v. CMCSS*, No. 3:22-cv-000675, a similar and related case.

trained provider, CMCSS, through its administration, intentionally refused to do so, or to change William's programming and supports in any meaningful way. Thus, the inadequacy of training is a conscious choice that caused the constitutional deprivation.

58. CMCSS has, under color of law, deprived William of the rights, privileges, and immunities afforded to him by the United States Constitution, including the right to due process under the Fourteenth Amendment, and specifically the right to be free from affirmative actions by CMCSS which directly increased William's vulnerability, thereby creating a special educational and emotional danger to William.

59. Specifically, despite knowledge of William's inability to read ("this kid can't read," in the ninth grade), CMCSS affirmatively and admittedly failed to provide for William's dyslexia and provide William with dyslexia-specific interventions. Thus, CMCSS created or increased the risk that Willliam would be exposed to acts of discrimination and educational, physical, and emotional harm.

## IV. Relief Sought

60. As a direct and proximate consequence of CMCSS's conduct as set forth herein, William has suffered damages, including without limitation, violations of his constitutional rights, emotional anxiety, diminished vocational ability, and the monetary expense of securing access to dyslexia interventions in and beyond his years of eligible public-school education in an effort to at least help him become a functional reader.

61. For relief, Plaintiffs seek a judgment that CMCSS violated the ADA, Section 504, and the Constitution's Fourteenth Amendment's Equal Protection and Substantive Due Process Clauses, as reflected above.

62. Plaintiffs seek declaratory relief making Defendant's policies, procedures, and practices regarding a student with dyslexia, served under an IEP for SLD-dyslexia, is not entitled to receive dyslexia specific accommodations unlawful.

63. Plaintiffs seek damages for the violations of William's federal statutory and constitutional rights as set forth above in detail, including but not limited to damages for reliance and expectation damages, vocational earnings loss, and emotional injury and dignity.

64. Plaintiffs pray **for an Order** directing Defendant to reform the aforesaid policies, procedures, and practices to fully comply with Section 504 and the ADA so that SLD-eligible students with reading limitations caused by dyslexia may, in fact, receive dyslexia-specific interventions; along with provision of continuing education toward compliance; and **for an Order** for the aforesaid damages to William.

65. Further, Plaintiffs seek their reasonable attorneys' fees and costs, and expenses under 42 U.S.C. §1988; and any further and just relief.

66. Finally, a jury is demanded for all claims that so may be tried.

Respectfully Submitted,

**GILBERT LAW, PLC**

/s Justin S. Gilbert

Justin S. Gilbert (TN Bar No. 017079)
100 W. Martin Luther King Blvd, Suite 501
Chattanooga, TN 37402
Telephone: 423.756.8203
justin@schoolandworklaw.com

**&**

**THE SALONUS FIRM, PLC**

/s Jessica F. Salonus
JESSICA F. SALONUS (28158)
139 Stonebridge Boulevard
Jackson, Tennessee 38305
Telephone: (731) 300-0970
jsalonus@salonusfirm.com
*ATTORNEYS FOR PLAINTIFFS*